# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles R. Norgle | Sitting Judge if Other than Assigned Judge | Nan R. Nolan |
|---|---|---|---|
| **CASE NUMBER** | 97 C 7515 | **DATE** | 10/28/2003 |
| **CASE TITLE** | Abbott Laboratories vs. Torpharm, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons stated in the attached Memorandum Opinion and Order, Abbott's motions in limine are granted in part and denied in part, and Torpharm's motions in limine are granted in part and denied in part.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | **Document Number** |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | OCT 2 9 2003 | | | |
| ✓ | Docketing to mail notices. | date docketed | | 243 |
| | Mail AO 450 form. | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | OCT 2 9 2003 | | |

Copy of orders given in open court

hmb

courtroom deputy's initials

U.S. DISTRICT COURT
CLERK
date mailed notice

Date/time received in central Clerk's Office

mailing deputy initials

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| **ABBOTT LABORATORIES, an**<br>**Illinois corporation** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 97 C 7515** |
| | ) | |
| **TORPHARM, INC., a Canadian corporation,** | ) | **Judge Charles R. Norgle, Sr.** |
| **APOTEX, INC., a Canadian corporation, and** | ) | **Magistrate Judge Nan R. Nolan** |
| **APOTEX CORP., a Delaware corporation,** | ) | |
| | ) | |
| **Defendants.** | ) | |

DOCKETED

OCT 2 9 2003

## MEMORANDUM OPINION AND ORDER

This lawsuit arises out of Defendants' ("TorPharm") alleged infringement of two patents owned by Plaintiff Abbott Laboratories ("Abbott") involving divalproex sodium, a substance used to treat epileptic seizures. For a fuller discussion of the factual background of this case, see Abbott Labs. v. TorPharm, Inc., 300 F.3d 1367 (Fed. Cir. 2002) and Abbott Labs. v. TorPharm, Inc., 156 F. Supp.2d 738 (N.D. Ill. 2001).

On March 29, 2001, the district court granted Abbott's motion for summary judgment of infringement of U.S. Patents No. 4,988,731 ("the '731 patent") and No. 5, 212,326 ("the '326 patent"). The district court's decision was based on the description of TorPharm's product in its package insert (part of its abbreviated new drug application ("ANDA") submission) and on Abbott's test data showing that TorPharm's biobatch material had a high molecular weight similar to material prepared according to the '326 and '731 patents. See Abbott Labs., 156 F.Supp. at 744-47. At the time the district court issued its decision, 22 motions in limine were pending, all of which had been

$\partial 43$

referred by the district court to this Court for determination.[1] The Court denied the parties' 22 motions in limine as moot, based on the district court's decision granting summary judgment. TorPharm appealed the district court's decision granting summary judgment, and the Federal Circuit affirmed in part and vacated in part the district court's decision, and remanded the matter, as explained more fully below. See Abbott Labs., 300 F.3d at 1370, 1372-80.

Subsequent to the remand order, the district court granted the parties leave to file an amended Final Pre-trial Order consistent with the Federal Circuit's decision and referred the matter, along with the 22 motions in limine previously declared moot and a motion by Abbott to strike the jury demand to this Court for ruling. On May 16, 2003, this Court recommended that Abbott's motion to strike the jury demand be granted and that a bench trial be held in this case. TorPharm filed objections to the Court's recommendation, which have not been ruled upon by the district court.

The parties now dispute the scope of the Federal Circuit's remand and argue how the motions in limine are impacted, if at all, by the appellate court opinion. The parties submitted briefs on the scope of the remand, which included additional arguments as to why certain evidence addressed in their motions in limine should be excluded or admitted based on the Federal Circuit's decision.[2] Accordingly, the Court issues, along with its ruling on the motions in limine, an opinion regarding the scope of the Federal Circuit's remand, i.e., what issues remain for trial.

---

[1]    The parties' motions were filed on August 30, 2000, and the parties briefed and presented oral arguments on their motions in September 2000. At the time the motions were filed and oral arguments presented, the district court had not granted Abbott's motion for summary judgment and this Court had not issued its recommendation that a bench trial be held.

[2]    Most recently, TorPharm filed a motion to amend the pretrial order which seeks to introduce new evidence contained in TorPharm's ANDA amendments which were filed in December 2002 and June 2003. The Court addresses that motion in a separate opinion.

# I. <u>SCOPE OF FEDERAL CIRCUIT'S OPINION</u>

Abbott argues that the Federal Circuit remanded this action for trial solely concerning the issue of whether TorPharm's product is an "oligomer," i.e, whether it contains a relatively small number of repeating units.  In support of this contention, Abbott argues that the Federal Circuit affirmed the district court's construction of the patent claims in issue, affirmed summary judgment as to all three of TorPharm's defenses, and agreed that there was no genuine dispute of material fact that TorPharm's proposed product met the remaining claim elements essential to demonstrating infringement. Pl's Supp. Mem., p.1.[3]

TorPharm agrees generally that the only issue remaining for trial is whether its proposed product infringes Abbott's patents based on the oligomeric structure of TorPharm's product but disagrees with Abbott on several specific points.  First, although acknowledging that the Federal Circuit affirmed the district court's claim construction and dismissal of TorPharm's non-enablement defense, TorPharm asserts that the Federal Circuit did not make any finding as to whether Abbott proved the oligomeric structure of its own product, i.e., whether Abbott's claimed oligomer exists. TorPharm argues that the Federal Circuit's opinion regarding whether Abbott's claimed oligomer exists pertains only to its discussion of TorPharm's nonenablement defense, an issue which TorPharm claims is associated with a higher standard of proof, and therefore, the Federal Circuit did not find that Abbott's claimed oligomer exists for purposes of infringement. Defs' Supp. Mem., pp. 10, 22-23.  TorPharm believes that evidence regarding whether Abbott's product is an oligomer may still be introduced at trial.  Abbott strongly disputes this contention, arguing that the Federal Circuit

---

[3]    Abbott acknowledges that the Federal Circuit did not explicitly address whether TorPharm's product met the claimed unit formula of Abbott's product.  However, for reasons provided in footnote 5, <u>infra</u>, the Court finds that the claimed unit formula element is not in dispute.

found that Abbott's claimed oligomer does exist.

In addition, TorPharm appears to argue that because the issue of infringement was left open by the Federal Circuit, evidence regarding *all* of the claim elements essential to demonstrating infringement may be introduced at trial, and not only the sole remaining element as to which the Federal Circuit found a dispute of material fact (i.e., the oligomeric structure). Defs' Supp. Mem., p. 20. Abbott argues that the issues surrounding the other claimed elements cannot be re-litigated, as the Federal Circuit either explicitly or implicitly affirmed the district court's judgment as to each of the remaining elements.

Finally, TorPharm argues that some of the evidence which was considered by the Federal Circuit in conjunction with its discussion on issues other than infringement (e.g., TorPharm's defenses) is also relevant to the issue still in dispute and therefore may be introduced for this purpose. TorPharm asserts that the fact that the evidence was considered by the Federal Circuit with respect to one issue does not mean it cannot be considered with respect to another issue still pending in the case.

The law of the case doctrine requires the district court "to confine its discussion [at trial] to the issues remanded." United States v. Morris, 259 F.3d 894, 898 (7th Cir. 2001); see also Aydin Corp. (West) v. Widnall, No. 96-1267, 1997 WL 413329, at *3 (Fed. Cir. 1997). To determine the scope of issues that are subject to the remand mandate, courts must eliminate issues that have been either "waived or decided." United States v. Husband, 312 F.3d 247, 250 (7th Cir. 2002). The latter point pertains to issues that have been decided either "expressly or by necessary implication" by the appellate court. Key v. Sullivan, 925 F.2d 1056, 1060 (7th Cir. 1991). See also United States v. Parker, 101 F.3d 527, 528 (7th Cir. 1996) ("the scope of the remand is determined not by formula,

but by inference from the opinion as a whole"). The law of the case doctrine applies only to issues actually decided, and not to dicta. <u>Geldermann, Inc. v. Financial Mgmt. Consultants, Inc.</u>, 27 F.3d 307, 312 (7th Cir. 1994).

The doctrine is subject to some generally recognized exceptions. For instance, it allows reconsideration of an issue in proceedings after remand where the evidence is new or different. <u>Wilder v. Apfel</u>, 153 F.3d 799, 803 (7th Cir. 1998); <u>see also</u> <u>Evans v. City of Chicago</u>, 873 F.2d 1007, 1014 (7th Cir. 1989) (stating that courts will reconsider a prior decision where "the evidence in a subsequent trial was substantially different; controlling authority has since made a contrary decision of law applicable to such issues; or the decision was clearly erroneous, and would work a substantial injustice").

In this case, the Federal Circuit: (1) affirmed the district court's claim construction of the term "oligomer;" (2) affirmed summary judgment in favor of Abbott on TorPharm's defenses of nonenablement, anticipation, and inequitable conduct (thus finding that Abbott's patents were valid and enforceable); (3) affirmed the district court's conclusion that no dispute of fact remains as to whether TorPharm's product met the following claim elements necessary to demonstrate infringement: (i) a 1:1 molar ratio of sodium valproate and valproic acid and the (ii) the claimed unit formula;[4] and (4) it reversed the district court's judgment that TorPharm's product infringed the '731 and '326 patents, based on its finding that a genuine issue of material fact existed regarding whether TorPharm's product is an oligomer. The Federal Circuit also noted that with respect to claim 5 of

---

[4]     The Federal Circuit did not explicitly address the district court's finding that TorPharm's product would meet Abbott's claimed unit formula. Abbott argues that the Federal Circuit's decision implicitly holds that TorPharm's product would meet the claimed unit formula. The Court agrees and finds that the claimed unit formula is not in dispute for trial.

the '326 patent, it was not disputed that TorPharm's product had certain physical characteristics. Abbott Labs., 300 F.3d at 1370, 1372-80.

Based on the Court's review of the Federal Circuit's decision as well as the law of the case doctrine, the Court finds that the only issue remaining in this case for determination on remand is whether TorPharm's proposed product has the claimed number of repeating units and therefore is an oligomer (or, with respect to claim 5 of the '326 patent, which does not claim any number of repeating units, whether TorPharm's proposed product consists of "a relatively small number of repeating units."). The Court does not agree with TorPharm's assertion that the Federal Circuit left unresolved the issue of whether Abbott's product is an oligomer. First, the Federal Circuit considered and rejected TorPharm's challenge to the district court's claim construction. See Abbott Labs., 300 F.3d at 1372. In that discussion, the Court stated: "[A]s we explain below, TorPharm has not substantiated its challenges against the existence of the oligomeric structure described by the specification and encompassed within the district court's claim construction." Id. The Federal Circuit also rejected TorPharm's contention that Abbott's patented oligomer does not "exist" in connection with its discussion of TorPharm's invalidity (nonenablement) defense. The Federal Circuit stated that TorPharm's assertion that the Food and Drug Administration ("FDA") concluded that Abbott's product was not an oligomer was a "mischaracterization" of the FDA's statements. Id. at 1378. Finally, in that same discussion, the Federal Circuit found that Abbott's patents do teach persons skilled in the art how to make and use the claimed oligomer. See id. ("In the absence of *any evidence* from which a reasonable fact-finder could conclude that the specification failed to teach one of ordinary skill in the art to make and use the subject matter defined by the properly construed claims, Abbott was entitled to summary judgment on TorPharm's non-enablement defense.")

(emphasis added). Based on these statements by the Federal Circuit, the Court finds that the issue of whether Abbott's claimed product is an oligomer has been resolved and is not subject to re-litigation. See Parker, 101 F.3d at 528 ("the scope of the remand is determined not by formula, but by inference from the opinion as a whole"); Key, 925 F.2d at 1060 (issues that have been decided either "expressly or by necessary implication" by the appellate court are not subject to the remand mandate).

Next, the Court finds that the claim elements which the Federal Circuit affirmed were met by TorPharm's product are not subject to re-litigation, as only the oligomeric structure of TorPharm's product is at issue at this point. Although the Federal Circuit left the infringement issue unresolved, it explicitly found that there was no genuine dispute of material fact that TorPharm's product met Abbott's claim elements of a 1:1 molar ratio of sodium valproate and valproic acid and the physical/chemical properties defined in claim 5 of the '326 patent (and it did not reverse the district court's finding as to the claimed unit formula element). Abbott Labs., 300 F.3d at 1372-75, 1377. The Court does not view these findings or the statements made in support of these findings as dicta. These issues cannot be re-litigated now. Morris, 259 F.3d at 898; Geldermann, 27 F.3d at 312.

Lastly, as will be discussed in the Court's discussion of the parties' motions in limine, evidence which was considered by the Federal Circuit in conjunction with its discussion of claim construction, infringement, or any of TorPharm's defenses may still be relied upon by TorPharm (assuming there are no valid objections), provided TorPharm can establish the relevance between the evidence sought to be used and the issue of whether TorPharm's product is an oligomer.

## II. ABBOTT'S MOTIONS IN LIMINE

**A.    Opinion Testimony Based Upon Observations of Undissolved Material During TorPharm's Manufacturing Process**

Abbott moves to bar Dr. Bernard Sherman and Dr. David Coffin-Beach from testifying about any conclusion they have drawn regarding the characteristics of TorPharm's final proposed product based on Dr. Coffin-Beach's visual observation of some undissolved material during TorPharm's manufacturing process.[5] Abbott's original motion raised three specific arguments: (a) Dr. Sherman has no personal knowledge of TorPharm's manufacturing process and, therefore, cannot testify that TorPharm's process resulted in undissolved material; (b) neither Dr. Sherman nor Dr. Coffin-Beach can testify as to their conclusions about the characteristics of TorPharm's product because those conclusions would be expert opinions and neither has been disclosed as an expert witness; and (c) even if Dr. Sherman and Dr. Coffin-Beach had been timely disclosed as expert witnesses, their opinions are unreliable under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993).

Abbott's supplemental memorandum concerning its motions in limine raises the additional arguments that the testimony should be excluded because the Federal Circuit's characterized it as "speculation" and ruled that there was an "absence of any genuine dispute of material fact whether TorPharm's product would meet the 1:1 molar ratio limitation of the patents in suit." Abbott Labs., 300 F.3d at 1375. TorPharm, in its response to Abbott's supplemental memorandum, argued that

---

[5]    At his deposition, Dr. Coffin-Beach testified that he observed a vat in which valproic acid was being heated and that after sodium valproate was added to the vat, he observed particles of undissolved sodium valproate in the liquid mixture. TorPharm argues that this testimony concerns the temperature limitation in its manufacturing process, which supposedly precludes the complete reaction of the ingredients sodium valproate and valproic acid, thereby resulting in a final product that does not contain the required 1:1 molar ratio.

the evidence should be admitted because the Federal Circuit's characterization of the testimony was dicta, the Federal Circuit failed to consider all of the evidence presented by TorPharm on this issue, and TorPharm has amended its ANDA to include additional evidence as to why it should be permitted to change the depiction in its proposed package insert.

The Court finds that the evidence should be excluded for several reasons. First, Dr. Sherman does not have personal knowledge of TorPharm's manufacturing process. TorPharm indicated that Dr. Sherman obtained a Canadian patent for the method for making sodium divalproex by adding sodium valproate directly to valproic acid and heating the mixture and that Dr. Sherman has personally observed this method. TorPharm has not shown, however, that the Canadian process for making sodium divalproex is the same as TorPharm's process. Moreover, Dr. Sherman admitted that he has never observed TorPharm's manufacturing process. He testified: "I have not been at TorPharm to observe it personally, but I rely upon what I am told and what has happened at Apotex when we have done similar things." Abbott's Ex. 12, pp. 418, 428. Because Dr. Sherman has no personal knowledge of TorPharm's manufacturing process, he cannot testify that TorPharm's process results in undissolved material. See Fed. R. Evid. 602 (stating, "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").[6]

---

[6] Abbott next argued that neither Dr. Sherman nor Dr. Coffin-Beach could testify as to their conclusions about the characteristics of TorPharm's product because those conclusions would be expert opinions and neither has been disclosed as an expert witness. The Court agrees that testimony by Drs. Sherman and Coffin-Beach that TorPharm's proposed product is not an oligomer with a 1:1 molar ratio of sodium valproate and valproic acid would be an expert opinion. This evidence goes beyond the common experience, knowledge, or observation of lay persons. Abbott incorrectly argues, however, that Drs. Sherman and Coffin-Beach cannot testify as experts because neither was disclosed as an expert nor filed an expert report. Not all experts are required to submit expert reports under Rule 26(a)(2)(B). Rule 26(a) requires submission of a written expert report only with respect

Abbott also argued that the opinions of Drs. Sherman and Coffin-Beach were unreliable under Daubert. The Supreme Court has held that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 597. This "gatekeeping" role "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." Kumho Tire Company, Ltd. v. Carmichael, 526 U.S. 137, 141 (1999). The purpose of the gatekeeping requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Id. at 1176. Daubert set forth four non-exclusive factors the trial court may consider when determining the reliability of expert testimony: (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the maintenance of standards controlling the technique's operation; and (4) whether the theory or technique has been generally accepted in the scientific community. Daubert, 509 U.S. at 593-594. The reliability inquiry is "a flexible one" and the four Daubert factors do not constitute a "definitive checklist or test." Kumho Tire, 526 U.S. at 150 (quoting Daubert, 509 U.S. at 594). TorPharm bears the burden of establishing the admissibility of the proposed expert testimony.

_____

to "a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony." Rule 26(a)(2)(B); see also Fed. R. Civ. P. 26, Advisory Committee's Notes to the 1993 Amendments (indicating that a "treating physician, for example, can be deposed or called to testify at trial without any requirement for a written report."). Neither Coffin-Beach nor Sherman were retained or specially employed to provide expert testimony in this case. Coffin-Beach is TorPharm's President, and Sherman is Chairman of the Board of Apotex, Inc. The current record does not indicate that Coffin-Beach's or Sherman's duties as employees regularly involve the giving of expert testimony. Thus, Rule 26(a)(2)(B) does not apply to Drs. Coffin-Beach and Sherman.

<u>Bradley v. Brown</u>, 852 F. Supp. 690, 697 (N.D. Ind.), <u>aff'd</u>, 42 F.3d 434 (7th Cir. 1994).

TorPharm has not shown that Dr. Sherman or Dr. Coffin-Beach possess any scientific basis or data to support their opinion that TorPharm's proposed product is not an oligomer with a 1:1 molar ratio of sodium valproate and valproic acid. Expert testimony is properly excluded where opinions are based on visual observation and the proponent fails to provide any evidence indicating that personal observation is a generally accepted methodology or any other indicia of reliability. <u>O'Connor v. Commonwealth Edison Co.</u>, 13 F.3d 1090, 1106-07 (7th Cir. 1994). Moreover, when the proffered opinions "clearly lend themselves to testing and substantiation by . . . scientific method," the absence of such testing may indicate a lack of scientific basis for the opinion. <u>Cummins v. Lyle Indus.</u>, 93 F.3d 362, 369 (7th Cir. 1996).

Dr. Coffin-Beach never tested the material in the kettle while the manufacturing process was ongoing or just prior to discharging the kettle and resolidifying. Abbott's App. Ex. 6, pp. 150-52. Dr. Coffin-Beach concluded that the particles were sodium valproate based on his observation that the particles "were characteristic of sodium valproate. They appeared the same as the sodium valproate that [was] charged to the vessel." <u>Id</u>, pp. 32-33. Based on his visual observation and 25 years of pharmaceutical development experience, Dr. Coffin-Beach determined that "somewhere between 5 and 10 percent" of the sodium valproate added to the valproic acid did not dissolve. <u>Id.</u>, pp. 51-56. Dr. Coffin-Beach admitted that he did not know whether it was still undissolved sodium valproate once the liquid was re-solidified. <u>Id.</u>, pp. 56-57, 126, 128-29. Dr. Coffin-Beach could not state the chemical structure of TorPharm's final product. <u>Id.</u>, pp. 129-31. He conceded that it was possible, but unlikely, that the undissolved sodium valproate in the vat dissolves on the hot roll as part of the flaking process later in the manufacturing process. <u>Id.</u>, pp. 136-38. Dr. Coffin-Beach also

conceded that it was possible that somewhere between the heating process in the vat and the flaking process, the sodium valproate reacts completely with the valproic acid. Id., pp. 178-79.

Dr. Sherman's opinion that TorPharm's divalproex sodium is not an oligomer with a 1:1 molar ratio of sodium valproate and valproic acid because there is undissolved material in the final product also fails to satisfy Daubert. Dr. Sherman has never personally observed the manufacturing process at TorPharm. Abbott's App. 12, p. 418. Dr. Sherman's opinion is based on what Coffin-Beach told him. Id., p. 106 ("I asked Coffin-Beach and he confirmed to me that all through the process you see the undissolved sodium."). Dr. Sherman also bases his opinion on what he observed at Apotex. Id., p. 418 ("I have not been at TorPharm to observe it personally, but I rely upon what I am told and what has happened at Apotex when we have done similar things."); see also id., pp. 418, 428. Neither Dr. Sherman nor Dr. Coffin-Beach tested TorPharm's final product to identify the presence of undissolved sodium valproate or the molecular or chemical structure of the product. Abbott's Ex. 12, pp. 118-22, 423-29, 440-43; Ex. 6, p. 28, 48, 50, 58, 125-26, 129, 131-32, 137, 209.

Thus, Dr. Coffin-Beach's opinion is based solely on his visual observation and Dr. Sherman's opinion is based on what Dr. Coffin-Beach told him and the process he observed at Apotex. TorPharm has not shown how observation of undissolved material during the manufacturing process alone is a reliable and generally accepted method of establishing that its final product does not have a 1:1 ratio of valproic acid and sodium valproate. TorPharm failed to conduct any testing on its product to determine whether undissolved sodium valproate exists and whether it is an oligomer with a 1:1 molar ratio of sodium valproate and valproic acid. The Federal Circuit characterized the testimony of Sherman and Coffin-Beach on this subject as "speculation." Abbott

Labs., 300 F.3d at 1375. Thus, Abbott's motion is granted.[7]

## B.    Evidence Relating to FDA Proceedings

Abbott moves to bar admission of all evidence relating to the FDA proceedings surrounding

Abbott's request for an additional ten years of market exclusivity for DEPAKOTE®.

In March 1983, the FDA approved DEPAKOTE® and awarded Abbott market exclusivity

during which no generic copies of the drug could be approved through September 1986.  In July

1986, Abbott petitioned the FDA for an additional ten additional years of market exclusivity for

DEPAKOTE®.  The FDA informally denied Abbott's request in a letter dated August 12, 1986 ("the

August 12 letter").  Abbott then submitted a citizen's petition on August 29, 1986 asking the FDA

for a final determination of whether DEPAKOTE® was entitled to ten years of market exclusivity.

In a letter dated February 11, 1988, the FDA denied Abbott's request ("the February 11 letter").  The

FDA attached the affidavit of Dr. Wood, the FDA's outside consultant, to the February 11 letter.

Both the August 12 and February 11 letters reveal that the FDA was considering whether the active

ingredient in DEPAKOTE® was salt of valproic acid, the active ingredient in DEPAKENE®.  To

qualify for the ten years of market exclusivity, the application must be "for a drug, no active

ingredient (including any ester or salt of the active ingredient) of which has been approved in any

other application under subsection (b)."  21 U.S.C. § 355(c)(3)(D)(i).  The FDA determined that

---

[7]    The Court also agrees with Abbott's supplemental argument that the testimony should be excluded for the additional reason that the Federal Circuit found an absence of any genuine dispute of material fact as to whether TorPharm's product would meet the 1:1 molar ratio.  The testimony of Sherman and Coffin-Beach relates to the issue of whether TorPharm's proposed product contained a 1:1 molar ratio of sodium valproate and valproic acid.  The Federal Court's findings in this regard should not be disregarded as dicta.  Because this issue has been resolved adversely to TorPharm, TorPharm cannot contest this issue at trial by presenting testimony from Sherman and Coffin-Beach about the molar ratio of TorPharm's product based upon Coffin-Beach's visual observation.

DEPAKOTE® did not qualify for ten years of exclusivity because it contains a salt of a previously approved active ingredient, valproic acid.

In its original motion, Abbott argued that evidence relating to the FDA proceedings should be excluded because it would be irrelevant if offered to establish that the FDA had determined that divalproex sodium is not an "oligomer" and correspondence from the FDA regarding Abbott's request for ten years of market exclusivity constituted inadmissible hearsay. In its supplemental memorandum, Abbott argued that there was no question that the evidence was irrelevant, as the Federal Circuit concluded that evidence from the FDA proceedings failed to show that the FDA had determined that DEPAKOTE® was not an oligomer.

None of the FDA correspondence (the August 12 and February 11 letters) nor Dr. Wood's affidavit indicates that the FDA determined that DEPAKOTE® is not an oligomer. Woods' affidavit states that he was asked by the FDA to determine whether the active ingredient in DEPAKOTE® is a salt of valproic acid, not whether DEPAKOTE® is an oligomer. Both the FDA and Dr. Wood concluded that DEPAKOTE® may be an oligomer and a salt. A finding by the FDA that DEPAKOTE is a salt is not inconsistent with Abbott's assertion that it is also an oligomer. The FDA stated in its February 11 letter:

> [C]haracterizing Depakote as an "oligomeric complex" also does not remove it from the definition of a salt. Assuming arguendo that sodium hydrogen divalproate is an oligomeric complex, FDA is unaware of any reason, and Abbott has offered none, to believe that a salt cannot be an oligomeric complex.

Abbott's Ex. 36, p. A/A008117. Dr. Wood stated that "[t]he fact that sodium hydrogen divalproate may be an oligomeric complex does not mean that it is not a salt." Id., p. A/A008138.

Moreover, the Federal Circuit rejected TorPharm's argument that the FDA had determined that Abbott's patented oligomer does not exist. Specifically, the Federal Circuit stated that TorPharm's assertion that the FDA concluded that the oligomer does not exist is "based on mischaracterization of the FDA's statements." Abbott Labs., 300 F.3d at 1378. The Federal Circuit stated: "The agency merely stated that *even if* Depakote was an oligomer, it was still a salt of a previously known active ingredient (valproic acid) and therefore not entitled to exclusivity available to drugs with novel active ingredients under 21 U.S.C. § 355." Id. Thus, the FDA proceedings are not relevant to show that Abbott's product is not an oligomer.

In its supplemental memorandum, TorPharm indicates that it intends to introduce evidence relating to the FDA proceedings surrounding Abbott's request for an additional ten years of market exclusivity to show that the FDA and Dr. Wood believed that molecular weight tests were not probative of the molecular structure of divalproex sodium. According to TorPharm, Abbott conducted the same molecular weight tests in the FDA proceedings and in this litigation. TorPharm argues that because Abbott relies on molecular weight tests to demonstrate the oligomeric structure of TorPharm's product, the FDA's response to Abbott's molecular weight tests as proof of oligomeric structure is relevant. Abbott's reply does not address TorPharm's argument that evidence relating to the FDA proceedings is relevant to showing that molecular weight tests are not probative of the molecular structure of divalproex sodium. Accordingly, the Court assumes Abbott has no objection to the admission of such evidence for this limited purpose.[8] Abbott's motion is denied

---

[8] Abbott's hearsay objection is overruled. Evidence relating to the FDA proceedings is not being offered for the truth of the matter asserted (that DEPAKOTE® is a salt of valproic acid, the active ingredient in DEPAKENE®), but merely to show the ability of molecular weight tests to prove molecular structure.

with the understanding that evidence relating to the FDA proceedings concerning Abbott's request for additional market exclusivity is admissible only if relevant to showing the ability of molecular weight testing to prove molecular structure.

## C.    <u>Evidence Relating to Claim Construction</u>

Abbott moves to bar TorPharm from introducing any evidence at trial relating to the construction of the claims of Abbott's patents. TorPharm, in its original response, argued that the above evidence was relevant to its defenses of patent invalidity and unenforceability. The Federal Circuit affirmed the district court's claim construction and dismissal of TorPharm's invalidity and unenforceability defenses. TorPharm now argues that some of the evidence relating to the claim construction is also relevant to the infringement issue. Specifically, according to TorPharm, various documents from the prosecution histories of Abbott's patents are relevant to show the tests which were selected by Abbott to demonstrate oligomeric structure, Abbott's recognition of the importance of single crystal x-ray diffraction testing in elucidating molecular structure, and the capability of Abbott's tests to prove oligomeric structure.[9]

Abbott argues that there is no dispute regarding the tests Abbott used in prosecuting the patents and in this litigation to demonstrate oligomeric structure and the fact that it used single-crystal x-ray diffraction testing to try to elicit structural information about its own invention has no bearing on whether TorPharm's product is an oligomer. Thus, Abbott argued, the evidence from the prosecution histories which TorPharm seeks to admit is irrelevant.

---

[9]     TorPharm does not appear to contend that the evidence relating to claim construction should be admitted because it is relevant to the issues of claim construction, patent invalidity, or unenforceability. The Court agrees with Abbott that evidence relating to claim construction may not be introduced to support either party's position on the issues of claim construction, patent invalidity, or unenforceability, as those issues have been resolved by the Federal Circuit.

Whether Abbott's molecular weight tests are sufficient to demonstrate that TorPharm's product is an oligomer is a relevant inquiry on remand. The sole remaining issue for determination on remand is whether TorPharm's product is an oligomer. Abbott used molecular weight tests to determine the molecular structure of TorPharm's product. TorPharm's experts focused on the inability of molecular weight measurements to provide definitive proof of molecular structure. The ability of molecular weight to prove molecular structure is relevant to whether TorPharm's product is an oligomer. TorPharm may introduce at trial those portions of the prosecution histories of Abbott's patents which relate to the ability of molecular weight tests to determine molecular structure. Abbott's motion is denied.

**D.    Evidence Relating to the University of Pittsburgh FAB-MS Testing**

Abbott argues that TorPharm should be barred from introducing at trial any evidence relating to fast atom bombardment mass spectrometry ("FAB mass") testing on a sample of sodium valproate that TorPharm commissioned from its undisclosed expert consultants at the University of Pittsburgh (the "Pittsburgh testing"). TorPharm intends to call at trial the University of Pittsburgh's Dr. Somayajula who ran the FAB mass tests. TorPharm expects Dr. Somayajula to testify about his experience in running FAB mass tests and collecting accurate data. TorPharm asserts that his testimony will concern what the tests objectively revealed and not his opinion or interpretation of the significance of the tests. TorPharm recognizes that Dr. Somayajula cannot give an expert opinion regarding the test results because he was not disclosed as an expert and did not prepare an expert report. Fed. R. Civ. P. 37(c).

Abbott argued that TorPharm's attempt to call the scientist who actually performed the tests should not be allowed as Dr. Hercules' supplemental report has previously been excluded as

untimely. Abbott asserted that allowing Dr. Somayajula to testify will simply permit TorPharm's attorneys to explain the meaning of these tests in closing argument and essentially act as the testifying experts. In its supplemental memorandum, Abbott further asserts that TorPharm waived any claim that this evidence was admissible because it did not raise the issue during the summary judgment proceeding or on appeal before the Federal Circuit. TorPharm, in response, argues that it did not waive this claim and that the evidence should be admitted because it is relevant to the issue remaining in this suit, namely, whether TorPharm's product is an oligomer.

The significance of the FAB mass test results is beyond the understanding of a lay person without expert testimony to interpret the results. TorPharm has not explained how the *meaning* of these tests will be conveyed, as Dr. Hercules has been barred from testifying about these tests and TorPharm has recognized that Dr. Somayajula cannot give an expert opinion regarding these test results. Without any explanation of the meaning of the FAB mass test results, the probative value of the test results is non-existent. Abbott's motion is granted.[10]

## E.  Evidence Relating to "Curing"

Abbott next moves to exclude any evidence relating to the heating or "curing" step in the mass production of DEPAKOTE®. Abbott believes that TorPharm's expert, Dr. Thomas Barton, will testify at trial that the "curing" step is necessary to create a product that meets the melting point specification of Claim 5 of the '326 patent. Abbott claims that it added a curing step when it scaled up to mass production of its commercial divalproex sodium, but that step is not disclosed in the patent. TorPharm relied on this evidence in support of its argument that Abbott's patents were

---

[10]     Because the Court finds this evidence to be inadmissible for the reasons stated herein, it does not reach the waiver argument raised by Abbott in its supplemental memoranda.

invalid as non-enabled. In its original motion, Abbott argued that Dr. Barton's evidence as to "curing" was unreliable under Daubert and irrelevant because Abbott was not required to disclose in the patent the steps needed to mass produce its commercial product. In its supplemental memorandum, Abbott argues that the evidence should be excluded as irrelevant because the Federal Circuit affirmed the district court's ruling that the patents are fully enabled.[11] TorPharm, in its supplemental memorandum, states that this motion was "linked" to its own motion to exclude evidence of comparison testing, described, infra, at III.D., "because the curing evidence concerns only Abbott's product." TorPharm appears to be indicating that it no longer objects to having this evidence excluded, as it has filed a motion to exclude evidence of Abbott's comparison testing. In any event, because the Federal Circuit affirmed the district court's ruling on TorPharm's enablement defense, the evidence is not relevant to the sole remaining issue of whether TorPharm's product is an oligomer. Accordingly, Abbott's motion is granted.

**F. Beverly Vincent's Testimony and Evidence Relating to Subpoena Served on Molecular Structure Corporation**

Abbott moves to bar introduction of the testimony of Dr. Beverly Vincent, an employee of Molecular Structure Corporation ("MSC"), and evidence relating to a subpoena TorPharm served on MSC on October 29, 1999. Abbott maintains that in 1981, Dr. Bauer contacted MSC to perform single crystal x-ray analysis on Abbott compound A-50711, divalproex sodium. According to Abbott, MSC was not able to grow a large enough crystal of divalproex sodium to obtain sufficient test data. In October of 1986, Dr. Bauer reported to the Patent and Trademark Office ("PTO") that

---

[11] The district court found that this "curing" evidence was irrelevant to enablement because the "curing" step related only to Abbott's efforts to scale up the production of divalproex sodium to commercial levels.

"[a]ttempts were made to elucidate the structure of the material of Example 1 by single crystal X-ray. However, the X-ray pattern contained too few lines to obtain a useful structure." TorPharm's Ex. 1, p. 010850. In connection with this case, TorPharm served a subpoena on MSC requesting, among other things, documents relating to Abbott compound A-50771, divalproex sodium. Vincent did most of the work for MSC locating documents responsive to the subpoena. MSC found no responsive documents.

TorPharm initially sought to use Vincent's testimony to show that Abbott never requested MSC to conduct single crystal x-ray testing on Abbott's divalproex sodium product. TorPharm believed this evidence to be relevant to its defense of inequitable conduct because it showed that Abbott may have intentionally misled the PTO. Abbott contended in its original motion that Vincent's testimony should be excluded as irrelevant, lacking in personal knowledge, and prejudicial. In its supplemental memorandum, Abbott argues that this evidence should also be excluded because the Federal Circuit affirmed summary judgment for Abbott on the issue of inequitable conduct. TorPharm responds that the evidence is still relevant because it "tend[ed] to corroborate Abbott's internal documents showing that when Abbott was confronted with the task of proving molecular structure, Abbott turned to single crystal x-ray diffraction testing." Defs' Supp. Mem., p. 17. In other words, TorPharm asserts that the evidence is relevant to the infringement issue because it shows that Abbott acknowledged the supremacy of (or at least, importance of) single crystal x-ray diffraction testing in elucidating molecular structure.

Vincent's testimony and the evidence related to the subpoena served on MSC must be excluded to the extent they are being relied upon to prove any inequitable conduct, as the Federal Circuit has affirmed summary judgment on that issue. Abbott Labs., 300 F.3d at 1379-80. However,

the ability of the tests Abbott used in this litigation to determine the molecular weight of TorPharm's

product is contested and still relevant. Thus, the evidence is admissible to the extent it is being relied

upon to show that Abbott turned to single crystal x-ray diffraction testing during the patent

prosecution when confronted with the task of proving molecular structure.

Abbott continues to argue that Vincent's testimony should be excluded because he has no

personal knowledge about whether Abbott in fact retained MSC to perform single crystal x-ray

testing on Abbott's divalproex sodium. In its motion, Abbott stated: "Based on the tiny fraction of

MSC documents that Vincent reviewed, his unfamiliarity with MSC filing procedures before 1989,

and the fact that no one at MSC today was working there in 1981, however, Vincent's testimony

does not make it any less probable that Dr. Bauer contacted MSC in 1981 to conduct single crystal

x-ray testing." Abbott's motion, p. 3. Although Vincent did not work at MSC in 1981, he has

personal knowledge of MSC's recording keeping system. Vincent has retrieved records from MSC's

archives during his ten years of employments and can testify to what he has learned about how MSC

organizes its archived documents and what he found in the archived documents.

Vincent testified that "[d]uring my ten years at Molecular Structure, I have had cause to go

back through old structural files to pull results for other customers. And in this time I've become

familiar with the way things have been handled prior to my joining the company." Defendants' Ex.

5, p. 23. Vincent explained how MSC searched for documents responsive to Defendants' subpoena:

> We retrieved invoice listings for work which was done in the late '70s through the
> late '80s to see if we could find invoice information about any billed materials that
> were done for Abbott, and we found files for three structural work projects which
> were done for Abbott Laboratories.

Id., pp. 7-8. MSC then retrieved six of two hundred fifty-six boxes of archived documents to search

for responsive documents. Vincent further explained how the relevance of the six boxes was determined:

> A.   We have [a] master list of the contents of the archived. From the description of the contents and from a file which was already on site here, which correlates to the contents of the structural files to which box they are in, we pulled three boxes which contained one file each for service work done for Abbott Laboratories and three other boxes which contained invoice information for the 1980 period–1980s period–excuse me.
>
> Q.   Did you find any invoice related to Abbott's compound 50711?
>
> A.   No, we did not.
>
> Q.   What else, if anything, did you do in connection with your search for documents?
>
> A    We pulled the three files of crystal structure work which were done for Abbott Laboratories in 1981, I believe, and I went through the contents of those files to determine if the compounds which were under investigation could possibly be related to this case.
>
> Q.   And what was your findings? What were your findings?
>
> * * *
>
> A.   The three materials which were submitted to us by Abbott Laboratories bear absolutely no similarity to the valproic acid derivatives which were covered by the subpoena.
>
> Q.   And what was your basis for the statement that the compounds that were tested were no resemblance to Abbott compound 50711?
>
> A.   I'm familiar with the Molecular Structure of valproic acid, and I made myself familiar with the structures which were submitted to us for examination. And as a Ph.D. chemist, I can state with confidence there is no molecular similarity between these materials.

Id., pp. 9-11. Vincent described his search of MSC's records as "thorough" and "extensive." Id., pp. 12–15, 18.

Abbott's motion is denied. Vincent's testimony and the evidence related to the subpoena served on MSC are relevant to the limited issue of Abbott's acknowledgment of the importance of single crystal x-ray diffraction testing in determining molecular structure. Abbott's points can be brought out on cross-examination and the trier of fact can adequately determine the weight to assign Vincent's testimony.

## G.    Evidence Relating to Dr. Stephen Spanton's Single Crystal X-ray Diffraction Testing

Abbott seeks to exclude any evidence relating to the single crystal x-ray diffraction testing performed by Dr. Stephen Spanton in the 1980s on a crystal found growing in the crack of a vial (the "Spanton Crystal"). In the late 1980s, Dr. Kurt VanScoik, a pharmacist at Abbott, discovered what he believed to be a crystal of divalproex sodium which had formed in a cracked vial. Dr. VanScoik believed the crystal was large enough to submit for testing and presented it to Dr. John Bauer at Abbott. Dr. Bauer forwarded the crystal to Dr. Spanton who performed the single crystal x-ray test. Dr. Spanton's single crystal x-ray test revealed that the compound had a 3:1 molar ratio of sodium valproate to valproic acid, rather than a 1:1 molar ratio like divalproex sodium. Dr. Spanton also used the single-crystal x-ray results from the compound to calculate a powder x-ray diffraction pattern for the compound. The powder x-ray diffraction pattern from the Spanton Crystal did not match the known powder x-ray diffraction pattern for divalproex sodium. Based on this fact, Dr. Spanton concluded that the crystal was not divalproex sodium. Because the substance Spanton analyzed was apparently not divalproex sodium, as initially thought, Abbott's scientists did not submit the results of this testing to the PTO during the patenting process.

TorPharm initially intended to have one of its experts, Dr. Robert A. Jacobson, opine at trial that Dr. Spanton obtained meaningful single crystal x-ray diffraction results showing that the

molecular structure of a crystal provided to him by Dr. Bauer was nonoligomeric and had a 3:1 molar ratio of sodium valproate and valproic acid, rather than a 1:1 molar ratio like divalproex sodium. TorPharm intended to claim that Abbott's failure to disclose these test results to the PTO constituted inequitable conduct which rendered the patents unenforceable.

Abbott, in its original motion, argued that all of the evidence in this case indicated that the Spanton Crystal was not a crystal of divalproex sodium and that the tests performed on the crystal were therefore irrelevant. In support of its argument, Abbott pointed out that Dr. Jacobson admitted he had never seen a sample of divalproex sodium and did not know whether it was possible to obtain a crystal of divalproex sodium or what the ratio of the starting materials were prior to the Spanton Crystal formation. Abbott's App. Ex. 9, pp. 55, 57-58, 105-08. Abbott also asserted in its motion that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice and confusion. In its supplemental memorandum, Abbott argues that the evidence should be excluded for the additional reason that the Federal Circuit considered this evidence in conjunction with TorPharm's inequitable conduct defense and affirmed the district court's grant of summary judgment for Abbott on that issue.

TorPharm argues that Abbott's action in pursuing this single crystal x-ray diffraction was "an admission by conduct" showing the purported supremacy of this test because Abbott pursued this testing despite having molecular weight test results. Abbott admits that "[s]ingle-crystal x-ray diffractometry is a well-recognized test used in elucidating chemical structure." Abbott's Supplemental Reply, p. 15. Abbott points out, however, that TorPharm's experts admit that the test is highly specialized and cannot be employed for every compound. Abbott argues that the mere fact that it attempted to perform this test during the patenting process does not suggest that all of the

-24-

other tests performed by it were incapable of demonstrating coherence with the patent claims.

To the extent TorPharm is relying on this evidence to show the supremacy of single crystal x-ray diffraction testing in determining molecular structure, the Court finds that the evidence is admissible for that limited purpose. The issue of the ability of molecular weight tests to determine molecular structure is relevant. This evidence may tend to show that the molecular weight tests performed on TorPharm's product do not unequivocally demonstrate that TorPharm's product is an oligomer. Although TorPharm's evidence may not carry the day, Abbott's criticisms go to the weight of the evidence. See Abbott Labs., 300 F.3d at 1376 (noting that the fact that TorPharm's experts prefer single-crystal x-ray crystallography as a method of determining molecular structure is not "particularly significant."). The trier of fact can adequately determine what, if any, weight should be accorded this evidence. Abbott's motion is denied.

## H.    Evidence Relating to ArRo's 1987 Testing

Abbott seeks to bar introduction of any evidence relating to the testing of Abbott's divalproex sodium performed by ArRo Laboratories ("ArRo") in 1987. In 1983, ArRo conducted vapor osmometry and size exclusion chromatography ("SEC") testing on Abbott's divalproex sodium. Abbott claims that the 1983 test results support its conclusion that its product is an oligomer containing about four to six repeating units. In 1987, Abbott asked ArRo to perform additional vapor phase osmometry and SEC testing on Abbott's compound. The 1987 test results differed from the previous test results achieved in 1983. According to Abbott, ArRo suggested that the differences in the SEC readings between the 1983 and 1987 tests were caused by different column packing material used, i.e., spherical silica in 1983 and styrene divinyl benzene gel in 1987. Abbott's Dr. John Bauer told the PTO that he believed the 1987 test results were unreliable for this reason.

Abbott's Ex. 45, p. 011179.

TorPharm originally attempted to use the 1987 test results to show that Abbott's divalproex sodium was not an oligomer and that Abbott engaged in inequitable conduct before the PTO. Abbott argued that the 1987 test results were irrelevant to determining the composition of Abbott's divalproex sodium and to the issue of Abbott's alleged inequitable conduct before the PTO. Abbott further argued that Dr. Thomas J. Barton's testimony that Abbott should not have discounted the 1987 tests results was irrelevant and unreliable under Daubert. Abbott also argued that the evidence was prejudicial and would be misleading to a jury.

In its supplemental memorandum, Abbott argues that the evidence should be excluded for the additional reason that the Federal Circuit rejected TorPharm's inequitable conduct defense as well as its argument that the patented oligomer does not exist. TorPharm contends that the 1987 test results should nevertheless be introduced as relevant to establish that tests such as vapor phase osmometry (VPO), which is conducted in a solution rather than a solid state, "give varying results based on the conditions of the tests" and that "vapor phase osmometry is unreliable and not reproducible and not a valid test for proving molecular structure." Defs' Supp. Mem., p. 19. Abbott, in reply, argues that the evidence is not relevant, as all scientific tests are susceptible to variance based upon testing conditions. Abbot also points out that TorPharm's own expert Dr. Barton has conceded that VPO is a well-recognized and valid scientific method for determining molecular weight.

The Court will allow TorPharm to introduce the 1987 test results to show that tests such as vapor phase osmometry give varying results based on the conditions of the tests and therefore may not be reliable for proving molecular structure. The evidence goes to the issue of whether the tests

being relied upon by Abbott (which include vapor phase osmometry) are reliable in establishing molecular structure -- the sole issue remaining in this case. TorPharm may not introduce this evidence to show that Abbott's patented oligomer does not exist or that Abbott engaged in inequitable conduct, as the Federal Circuit has resolved these issues. Abbott's motion is denied.

I. **References to TorPharm as Manufacturers of Lower Cost Drugs or TorPharm's Product As a Lower Cost Alternative to Abbott's DEPAKOTE®**

Abbott moves to exclude any reference to TorPharm as a manufacturer of lower cost drugs or to TorPharm's product as a lower cost alternative to Abbott's DEPAKOTE®. In its motion, Abbott contended that such references would be designed only to appeal to the jurors' pecuniary interests in the hope of causing them to find for TorPharm because its proposed drug may be cheaper than Abbott's drug. Abbott believed such references would be irrelevant and prejudicial. The parties did not raise any new arguments in their supplemental briefs.

Since Abbott filed its motion, this Court recommended that there be a bench trial in this case. Abbott's argument that such references would appeal only to the jurors' pecuniary interests may no longer be applicable. Abbott's argument regarding the relevance of these references still applies. The cost of TorPharm's proposed drug does not make it more or less probable that the drug infringes Abbott's patents. Thus, any evidence or argument that TorPharm is a manufacturer of lower costs drugs or that TorPharm's divalproex sodium would be a lower cost alternative to Abbott's DEPAKOTE® is irrelevant. Fed. R. Evid. 401. Abbott's motion is granted.

J. **Evidence Relating to Undisclosed Consultant Report Relied Upon By Dr. Nicholas Cappuccino**

Abbott moves to exclude any evidence relating to the undisclosed consultant report relied upon by Dr. Nicholas Cappuccino (Defendants' Vice President of Research and Development).

TorPharm has not objected to an order granting Abbott the specific relief requested. Thus, any testimony at trial based upon or regarding the Consultant Report, including, but not limited to, any testimony by Dr. Cappuccino concerning the contents of the report or opinions based on the report is barred. Dr. Cappuccino, a senior scientist at Apotex, Inc., who did substantive work on TorPharm's proposed product, is not, however, prohibited from testifying to any knowledge he obtained concerning the chemical nature and structure of TorPharm's proposed product and Abbott's product independent of the consultant report. Dr. Cappuccino need not have filed an expert report to provide expert testimony because he was not retained or specially employed to provide expert testimony and his duties at Apotex, Inc. do not regularly involve giving expert testimony. Fed. R. Civ. P. 26(a)(2)(B).

### K.  Testimony From TorPharm's Purported Experts as to Any Opinions That Have Not Been Previously Disclosed to Abbott

Abbott moves to bar any testimony from TorPharm's experts, Drs. David M. Hercules, Robert A. Jacobson, and Thomas J. Barton, as to any opinions that have not been previously disclosed to Abbott. Federal Rule of Civil Procedure 26(a)(2)(B) requires an expert to disclose, among other things, "a complete statement of all opinions to be expressed and the basis and reasons therefor." Rule 37 provides:

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence at a trial, a hearing, or on a motion any witness or information not so disclosed.

Fed. R. Civ. P. 37(c)(1). Thus, unless the failure to disclose was substantially justified or harmless, an expert may not testify at trial regarding opinions that have not been disclosed.

During his deposition, Dr. Hercules stated that he was not offering expert testimony

concerning single crystal x-ray analysis, infrared, solid-state NMR, powder x-ray diffraction, melting

point analysis, DSC, elemental analysis, or SEC. TorPharm has not suggested otherwise.

Accordingly, this part of Abbott's motion is granted, and Dr. Hercules is barred from offering any

opinions regarding any of the above tests. Abbott also argued that Dr. Hercules' testimony regarding

vapor phase osmometry and freezing point depression testing should be limited to what he

specifically testified to at his deposition. Unlike his testimony regarding the above tests, Dr.

Hercules' deposition testimony did not limit his trial testimony regarding vapor phase osmometry

and freezing point depression testing. Dr. Hercules' opinion testimony regarding vapor phase

osmometry and freezing point depression is limited by the opinions set forth in his expert reports

(unless he can demonstrate that a failure to disclose an opinion was substantially justified or

harmless), not his deposition testimony. Moreover, testimony regarding vapor phase osmometry and

freezing point depression testing is relevant to the issue still in dispute in this case – the molecular

structure of TorPharm's product. Accordingly, this portion of Abbott's motion is denied.[12]

Abbott next maintains that Dr. Robert A. Jacobson should not be allowed to opine about the

original ratio of the materials that grew into the Spanton Crystal. Abbott's objection in its original

motion appeared to be based on the fact that Dr. Jacobson had no personal knowledge concerning

the ratio of the original materials, not that Dr. Jacobson's report failed to include the opinion Abbott

seeks to exclude. TorPharm argued that this opinion was included in Dr. Jacobson's expert report

and was relevant to TorPharm's inequitable conduct defense. The Federal Circuit rejected

---

[12]     Dr. Hercules' testimony is also limited by the scope of the remand, as discussed above.
Thus, Dr. Hercules may not offer any opinion at trial about the construction of the claim terms or suggest
that the patented oligomer does not "exist." Abbott Labs., 300 F.3d at 1372, 1378.

TorPharm's arguments regarding the Spanton Crystal testing, affirming judgment in Abbott's favor on TorPharm's inequitable conduct defense. As such, Dr. Jacobson is precluded from testifying about the single crystal x-ray diffraction study to the extent it relates to the inequitable conduct issue or any other issue outside the scope of the remand, as described herein. This portion of Abbott's motion is granted.

Finally, in its original motion, Abbott also appeared to argue that Dr. Thomas J. Barton should be precluded from offering any opinions regarding single-crystal x-ray diffraction and FAB mass testing because he stated at his deposition that he was not an expert in single-crystal x-ray diffraction or FAB mass testing. Whether Dr. Barton is qualified to offer expert testimony shall be determined by the district court, not the witness. Moreover, Abbott failed to explain in its motion what undisclosed opinions it believed Dr. Barton would testify to and, thus, how Rules 26 and 37 apply. Similarly, Abbott pointed to Dr. Barton's testimony that if he had performed freezing point depression and vapor phase osmometry tests he would have obtained test results similar to those of Abbott's experts. Abbott argued that this testimony narrows the scope of testimony he should be allowed to offer at trial. Abbott did not specify in its motion what undisclosed testimony it believed Dr. Barton would offer at trial. Thus, these arguments are unavailing.

In its supplemental memorandum, Abbott argues that Dr. Barton should be barred from offering any opinion at trial about either the Spanton Crystal testing or other issues relating to TorPharm's inequitable conduct defense, or the proper construction of the claim terms or offer any suggestion that the patented oligomer does not "exist." Abbott's argument is based on the fact that the Federal Circuit has already addressed and ruled upon these issues. The Court agrees that Dr. Barton cannot offer his opinion regarding any of the above tests to the extent they relate to

-30-

TorPharm's inequitable conduct defense, the proper construction of the claim terms, or TorPharm's assertion that the patented oligomer does not "exist," as these issues have been resolved by the Federal Circuit. Dr. Barton may testify regarding whether TorPharm's product is an oligomer – the sole issue remaining in this case. Abbott's motion to bar Dr. Barton from testifying is denied in part and granted in part.

## L.    Evidence Relating to Affirmative Defenses

In its original motion, Abbott moved to exclude all evidence relating to following six of the nine affirmative defenses asserted by TorPharm: sham litigation, patent misuse, unclean hands, estoppel, Paragraph IV certification, and failure to state a claim. Abbott maintained that TorPharm waived these six affirmative defenses by failing to raise them in opposition to Abbott's summary judgment motion. TorPharm's response to that motion asserted only that its affirmative defense of Paragraph IV certification had not been waived. Thus, TorPharm does not contest the exclusion of evidence relating to the five affirmative defenses of sham litigation, patent misuse, unclean hands, estoppel, and failure to state a claim, and this portion of Abbott's motion is granted.

In its supplemental memorandum, Abbott argues that evidence relating to TorPharm's three remaining affirmative defenses – inequitable conduct, non-enablement, and anticipation – should also be excluded, as those defenses have now been resolved by the Federal Circuit in Abbott's favor. With respect to TorPharm's Paragraph IV certification affirmative defense, Abbott argued that evidence on this issue should be limited to whether TorPharm's product is an oligomer. TorPharm, in its supplemental memorandum, does not dispute that the affirmative defenses of inequitable conduct, non-enablement, and anticipation have been resolved by the Federal Circuit but argue that evidence relating to those defenses may also be relevant to the infringement issue. TorPharm did

not specify which evidence relating to any of these affirmative defenses it wished to introduce or how such evidence was relevant to the infringement issue. Thus, the Court finds that Abbott's motion is also granted with respect to the affirmative defenses of inequitable conduct, non-enablement, and anticipation. All that remains to be decided is whether TorPharm has waived its right to introduce evidence relating to its affirmative defense of Paragraph IV certification.

An applicant submitting an ANDA (abbreviated new drug application) seeking approval by the FDA of a generic drug must certify one of four statements: (i) the listed drug is not patented; (ii) the listed drug's patent has expired; (iii) the expiration date of the listed drug's patent; or (iv) the listed drug's patent "is invalid or . . . it will not be infringed by the manufacture, use, or sale of the new drug" covered by the ANDA. <u>Bayer AG v. Elan Pharmaceutical Research Corporation</u>, 212 F.3d 1241, 1244 (Fed. Cir. 2000). The last statement is referred to as a Paragraph IV certification. When an applicant submits an ANDA with a Paragraph IV certification, it must notify the patent's owner of the certification. <u>Id</u>. If the ANDA contains a Paragraph IV certification and all applicable scientific and regulatory requirements are met, approval of the ANDA is immediate unless the patent owner brings an action for infringement within forty-five days of receiving the notice required under 21 U.S.C. § 355(j)(2)(B). <u>Id</u> at 1245. "A Paragraph IV certification . . . is deemed to be an act of infringement 'if the purpose of such a submission is to obtain approval under the [FDCA] to engage in the commercial manufacture, use, or sale of a drug . . . claimed in a patent or the use of which is claimed in a patent before the expiration of such a patent." <u>Id.</u>

Here, TorPharm filed two Paragraph IV certifications. In its Paragraph IV certifications, TorPharm stated that Abbott's patents would not be infringed because its proposed divalproex sodium was not an oligomer comprising of about 4, about 4 to 6, or about 6 of the repeating units

of sodium valproate/valproic acid in a 1:1 molar ratio as set forth in the claims of Abbott's patents. TorPharm raised this same argument in response to Abbott's motion for summary judgment and thus, it is not waived. Evidence concerning the number of subunits relates to the infringement issue and, more specifically, to the oligomeric structure of TorPharm's product. Thus, Abbott's motion is denied with respect to the affirmative defense of Paragraph IV certification.

## III. TORPHARM'S MOTIONS IN LIMINE

### A.    Evidence Relating to TorPharm's Biobatch to Demonstrate Infringement

TorPharm moves to prohibit Abbott from introducing evidence relating to TorPharm's divalproex sodium biobatch for purposes of showing patent infringement. TorPharm was required to submit to the FDA a sample of its divalproex sodium, known as a "biobatch," in connection with its ANDA filing. TorPharm produced to Abbott's counsel a sample of its product drawn from the same batch submitted in connection with the ANDA. Abbott's experts conducted several scientific test procedures on it.

TorPharm's motion relies solely on Bayer, 212 F.3d 1241, in which the Federal Circuit held that the patent holder's reliance on the biobatch to show infringement was misplaced because the ANDA directly addressed the issue of infringement and mandated a finding of no literal infringement. The Bayer court reaffirmed its decision in Glaxo, Inc. v. Novopharm, Ltd., 110 F.3d 1562, 1569-70 (Fed. Cir. 1997), in which it "approved of the district court looking to a biobatch for help in deciding the issue of infringement . . . because the ANDA specification did not define . . . the compound in a manner that directly addressed the issue of infringement." Bayer, 212 F.3d at 1250.

In its motion, TorPharm contended that the ANDA demonstrated that its proposed divalproex sodium product was noninfringing, and therefore, there was no need to rely on the biobatch. The claims of Abbott's patents require, among other things, an oligomer of a certain unit formula which depicts a hypothetical unit having one molecule of sodium valproate and one molecule of valproic acid. TorPharm relies on a "Note" to step 14 of their 19-step mixing and flaking process. The "Note" states that "[o]bservable particles of solid Sodium Valproate will be present in the mixture at the end of this step." TorPhram also emphasizes the temperature limitation of 106° C during the process. According to TorPharm:

> While TorPharm begins its manufacturing process for divalproex sodium by measuring "equimolar" amounts of two chemical ingredients or "starting materials" (*i.e.*, sodium valproate, which is a solid, and valproic acid, which is a liquid), those chemical ingredients or starting materials do not combine or reach to form a compound having units with 1 molecule of sodium valproate and 1 molecule of valproic acid. This is because the manufacturing process specified in TorPharm's ANDA–which is the best evidence of the product TorPharm intends to produce–does not permit the valproic acid to be heated enough to completely dissolved [sic] the sodium valproate. In accordance with TorPharm's ANDA, the starting materials are mixed and heated, during which a portion of the solid sodium valproate dissolves in the hot valproic acid. But the heating process is stopped at a temperature of 106° C, which is before all of the sodium valproate is dissolved.

TorPharm's motion, pp. 2-3. Abbott, in its response to the motion, argued that Bayer provided no support for TorPharm's position because the ANDA does not directly show that TorPharm's product was non-infringing, and in fact, the ANDA was consistent with the results of the biobatch.

In its supplemental memorandum, Abbott reasserts its argument that Bayer supports its position and argues that the evidence should be admitted for the additional reasons that: (1) TorPharm waived this argument by not challenging on appeal the district court's reliance on Abbott's testing in awarding summary judgment, and (2) the Federal Circuit approved the district

court's consideration of the biobatch testing as part of the infringement analysis.

Abbott's testing of TorPharm's biobatch is relevant to the determination of infringement because TorPharm's ANDA does not directly address whether their <u>final</u> <u>product</u> will have a 1:1 molar ratio of sodium valproate and valproic acid of the requisite unit formula. The fact that observable particles of solid sodium valproate may be present in TorPharm's liquid mixture at the end of step 14 does not establish that the final product contains undissolved sodium valproate. Moreover, unlike the ANDA in <u>Bayer</u> which described controls used in the manufacturing process to ensure that the specification was met, TorPharm's ANDA does not contain any testing requirement to ensure that its final product contains undissolved sodium valproate. In addition, the Federal Circuit approved the district court's consideration of the biobatch testing as part of the infringement analysis. <u>Abbott Labs.</u>, 300 F.3d at 1375-76. The Court finds the evidence to be admissible under this ground, as well. <u>See</u>, <u>e.g.</u>, <u>Key</u>, 925 F.2d at 1060. Thus, TorPharm's motion is denied.

**B.** **Evidence of Bioequivalence Claims in TorPharm's FDA Filings and Assertions That TorPharm's Labeling Is "The Same" As the Approved Labeling for Abbott's DEPAKOTE®**

TorPharm also moves to bar evidence of bioequivalence claims in TorPharm's FDA filings and evidence that it has stated, for FDA purposes, that its labeling for divalproex sodium is "the same" as Abbott's labeling for DEPAKOTE®. TorPharm submitted documents in connection with the filing and prosecution of its ANDA showing its proposed product to be bioequivalent to Abbott's product. TorPharm also submitted documents relating to proposed labeling and package inserts, stating that the generic and branded products were the "same" for FDA purposes.

The FDA requires producers of generic drugs to use the same labeling that was approved for the sale of the pioneer drug and to prove bioequivalency. 21 CFR § 314.94 (a)(7), (8). While "same" may be something less than "identical," "whatever difference may exist between 'same' and 'identical' is narrow and intended to prevent misstatements." SmithKline Beecham Consumer Healthcare v. Watson Pharmaceuticals, Inc., 211 F.3d 21, 27 (2d Cir. 2000).

In its original motion, TorPharm argued that evidence of its bioequivalence claims and its statements that its labeling was the same as Abbott's labeling for DEPAKOTE® was irrelevant because product-to-product comparisons in an infringement analysis are impermissible. TorPharm further argued that this evidence was unfairly prejudicial because of "the potential for a juror to impute to TorPharm an admission of patent infringement from the mere filing and prosecution of its ANDA—where the elements of an ANDA are required by federal regulation." Abbott argued that the admissions made by TorPharm to the FDA in its ANDA are not irrelevant or unfairly prejudicial, as they relate directly to the issue of infringement.

In its supplemental memorandum, Abbott further argues that this evidence should not be excluded because TorPharm made this very argument to the Federal Circuit, and it was rejected. Pl's Supp. Mem., pp. 23-24. TorPharm asserts in its supplemental memorandum that the Federal Circuit found that the chemical depiction contained in TorPharm's ANDA did not establish that TorPharm's proposed product had an oligomeric structure, and that the bioequivalence statements which Abbott seeks to introduce will only confuse the infringement issue. TorPharm further argues that its ANDA has been amended to submit new evidence to support a change in the chemical depiction in the package insert, which did not exist at the time the Federal Circuit issued its decision. Abbott replies that even if the FDA accepts the proposed changes to the ANDA labeling that does not detract from

the relevance or admissibility of admissions TorPharm made in the version of its labeling which was considered on appeal. The Court will address these arguments in turn.

As an initial matter, because this Court has recommended that a bench trial be held, the Court finds the danger of unfair prejudice to be of little concern here. The same is true with respect to TorPharm's argument that the introduction of the bioequivalence statements will cause confusion with respect to the infringement issue. As to the question of relevance, the Court agrees that the Federal Circuit has addressed and rejected TorPharm's argument that the evidence is irrelevant because it is forced by law to duplicate Abbott's package insert. See Abbott Labs., 300 F.3d at 1374 and n.2. Moreover, the Court agrees that the Federal Circuit relied on the statements in the ANDA in determining whether TorPharm's product infringed Abbott's product. See id. at 1374 ("There is little need for the infringement inquiry to proceed further on this point, for the ANDA would seem to define the compound in a manner that directly addresses the question of infringement."). While TorPharm is correct in asserting that the Federal Circuit found the chemical depiction contained in TorPharm's ANDA to be insufficient to establish the presence of an oligomeric structure [see id. at 1377], that does not mean the Federal Circuit found the evidence contained in the ANDA to be irrelevant to its infringement inquiry. To the contrary, as mentioned above, the Federal Circuit found the statements in the ANDA to be relevant to the question of whether TorPharm's product would meet the 1:1 molar ratio limitation of the patents in suit. Finally, TorPharm's argument that its ANDA has been amended since the Federal Circuit issued its decision also does not require the exclusion of the evidence at this time. The FDA has not accepted the proposed changes to the ANDA labeling. If the FDA accepts changes to the ANDA labeling, the Court may then reconsider whether to exclude this evidence. TorPharm's motion is denied.

-37-

## C. Expert Opinion Testimony of Molecular Weight Testing to Prove Molecular Structure

TorPharm moves to bar Abbott from introducing through its experts any evidence that molecular weight testing demonstrates the molecular structure of TorPharm's proposed divalproex sodium product. Abbott conducted three molecular weight tests on TorPharm's proposed divalproex sodium product: freezing point depression, vapor-phase osmometry and FAB mass. TorPharm maintained that these tests could not determine the structure of divalproex sodium, only an observed weight. TorPharm therefore argued that Abbott's experts' application of molecular weight testing to show molecular structure was unreliable under Daubert, as it was not subjected to peer review and publication and is not a theory that enjoys general acceptance within the relevant scientific community.

Abbott, in its response to TorPharm's motion, argued that the molecular weight tests were scientifically reliable because Judge Zagel found them to be appropriate to determine infringement in the Alra lawsuit[13] and because even TorPharm's experts acknowledged that the tests were scientifically accepted methods. Abbott also argued that the evidence was not unreliable under Daubert and that TorPharm's arguments went to the weight, not admissibility, of the evidence. In its supplemental memorandum, Abbott further argues that the Federal Circuit's decision made clear that TorPharm's motion must be denied, as the Federal Circuit specifically considered those tests and stated that "a trier of fact might well infer the existence of the claimed oligomeric species from Abbott's molecular weight data." Abbott Labs., 300 F.3d at 1375-77. TorPharm did not respond to this argument in its supplemental memorandum.

---

[13] See Abbott Labs. v. Alra Labs., 1997 WL 667796 (N.D. Ill. 1997), discussed infra, at Part III.F.

TorPharm's motion is denied. Although TorPharm maintained that Abbott's testing was unreliable because it had not been subjected to peer review and publication and is not a theory that enjoys general acceptance within the relevant scientific community, its argument was not supported by evidence in the record. Both of Abbott's experts, Drs. Byrn and Atwood, opined that freezing-point depression, vapor-phase osmometry and FAB mass tests were well known and accepted methods in the scientific community for determining the structure of a substance. TorPharm misstated the record when it claimed that Dr. Atwood admitted that freezing-point depression tests were incapable of proving the necessary end-to-end structural arrangement. Dr. Atwood merely testified that freezing-point depression testing was insufficient alone to prove molecular structure but that "[i]n combination with other techniques, with knowledge of the system, [freezing-point depression] can reveal structural information." Abbott's Ex. 1, p. 60. Moreover, TorPharm's expert, Dr. Thomas Barton, testified that those tests can be used to determine molecular weight and molecular weight can be one piece of information used to determine the chemical structure of a compound. Abbott's Ex. 2, pp. 177-78. TorPharm's other expert, Dr. David Hercules, testified that Dr. Atwood's freezing-point depression and vapor-phase osmometry tests were "consistent with" (although not proof of) the oligomeric structure of divalproex sodium. Dr. Hercules further testified that FAB mass tests can "in some cases" provide information concerning "the existence of or distribution of oligomers." Abbott's Ex. 8, pp. 72-73, 148. Finally, TorPharm's own scientist, Dr. Shui Sheng Hu, admitted that molecular weight tests were necessary to determine whether divalproex sodium is an oligomer. Abbott's Ex. 4, p. 74 (Q: And how do you determine whether something is an oligomer? A. You have to use molecule [sic] weight determination.). Abbott's molecular weight testing testimony satisfies Daubert.

-39-

TorPharm further claimed that Abbott's molecular weight testing was an unreliable method of determining molecular structure because the tests were not conducted on a solid state divalproex sodium. TorPharm failed to present any evidence supporting this assertion. Similarly, TorPharm argued, without any citation to evidence, that the values obtained from the vapor phase osmometry tests were unreliable because of unacceptably high standard deviations. TorPharm's only evidentiary support for this argument was the opinion of Professor Fred Basolo of Northwestern University. Basolo stated only that he had a "tentative feeling" that divalproex sodium is "best described" as a sodium salt "with essentially ionic bonding." Professor Basolo did not state an opinion regarding the three molecular weight tests at issue in this motion. His testimony does not provide a sufficient basis for excluding Abbott's molecular weight testing testimony. TorPharm's assertion that the molecular weight tests are not scientifically reliable methods of determining molecular structure goes to the weight of the evidence, not its admissibility.

Finally, as Abbott pointed out in its supplemental memorandum, the Federal Circuit found Abbott's molecular weight testing to be relevant to the infringement issue. Although the Federal Circuit stated that Abbott must "demonstrate infringement in terms of [oligomeric structure and the number of repeating units] rather than by a molecular weight measurement per se," it considered the molecular weight tests in its infringement analysis and stated that the "question is close" whether Abbott's molecular weight tests were sufficiently probative of an oligomeric structure to entitle Abbott to judgment as a matter of law. Abbott Labs., 300 F.3d at 1376-77. TorPharm's motion is therefore denied.

## D. Evidence Comparing TorPharm's Proposed Product to Abbott's Commercial Product or Example 1 Product

TorPharm seeks to exclude evidence comparing TorPharm's proposed product to Abbott's commercial product and the product made by following the Example 1 methodology set forth in Abbott's patents. In its motion, TorPharm argued that it is legal error to compare the accused product to another product in the infringement analysis. TorPharm relied on the Federal Circuit's decision in Zenith Labs. v. Bristol-Myers Squibb, 19 F.3d 1418, 1423 (Fed. Cir. 1994). In Zenith, the patentee attempted to establish infringement by comparing the diffraction pattern of the alleged infringing drug to the diffraction pattern of the patented drug. The Federal Circuit held: "As we have repeatedly said, it is error for a court to compare in its infringement analysis the accused product or process with the patentee's commercial embodiment or other version of the product or process; the only proper comparison is with the claims of the patent." Id. at 1423.

Abbott argued that its comparison of TorPharm's product to its commercial and preferred embodiments was permissible in this case because it merely corroborated its evidence that TorPharm's product infringes each of the claims of Abbott's patents. Thus, Abbott argued that the rule enunciated in Zenith applies only when infringement is based solely on a comparison of the accused product to a commercial embodiment. The Zenith court did not limit its holding to infringement analyses based solely on a comparison of the accused product to a commercial embodiment. In Zenith, the improper comparison was "an essential element," but not the only element, in the district court's conclusion that infringement occurred. Moreover, Abbott has not cited and the Court has not found any authority indicating that a party may compare the infringing product to the patentee's commercial embodiment if the evidence is merely corroborative of other

evidence of infringement. Thus, Abbott's argument is unavailing.

In its supplemental memorandum, Abbott argues that TorPharm's motion should be denied for the additional reason that the Federal Circuit considered Dr. Atwood's comparison of TorPharm's product to the Example 1 material as part of its infringement analysis and did not make any suggestion that such comparison was inappropriate. In support of this contention, Abbott points to the Federal Circuit's discussion of Dr. Atwood's freezing point depression test in which Dr. Atwood "obtained a value of 2000, consistent with measurements of a sample prepared according to Example 1 of the patents in suit." Abbott Labs., 300 F.3d at 1376. TorPharm responds that the Federal Circuit's statement regarding the Example 1 material was merely a "mention[] in passing," as the Federal Circuit made this statement in conjunction with its conclusion that Abbott's molecular weight measurements did not provide definitive proof of oligomeric structure for purposes of summary judgment.

The Court does not view the Federal Circuit's description of Dr. Atwood's freezing point depression test as amounting to an "approval" of a comparison of TorPharm's product to Abbott's product or the Example 1 material in an infringement analysis. Nor does the Court agree that the Federal Circuit relied on such a comparison in its infringement analysis. Rather, as TorPharm points out, the Federal Circuit's statement regarding the Example 1 material was made in conjunction with its conclusion that the tests relied upon by Abbott were insufficient to establish summary judgment on the infringement issue. The Federal Circuit's statement in this regard does not constitute law of the case, as the Federal Circuit did not decide, either explicitly or implicitly, that it was acceptable to compare TorPharm's product to Abbott's product or the Example 1 material, even as corroborative evidence, in the infringement analysis. TorPharm's motion is granted. See

Geldermann, 27 F.3d at 312 (stating that law of the case doctrine applies only to issues actually decided, not to dicta).[14]

**E.    Evidence of Abbott's Purported Substantial Research Efforts and Significant Monetary Investment to Develop DEPAKOTE®**

TorPharm seeks to exclude evidence that Abbott engaged in substantial research or spent significant sums of money to develop DEPAKOTE®.

In its motion in limine, TorPharm asserted that Abbott "might try to engender sympathy for itself–and try to cloak its patent in a veneer of legitimacy–by alluding to its investment of time, effort, and money that went into the development of DEPAKOTE®." Abbott responded that this evidence was relevant to understanding why the patent laws granted Abbott a period of market exclusivity. The Court finds that the objective of the patent laws can be generally explained at trial without introducing specific evidence concerning Abbott's research efforts and expense. TorPharm also asserted in its motion that Abbott did not undertake extensive safety and efficacy trials for divalproex sodium. Abbott argued that if TorPharm takes this position at trial (i.e., that Abbott rushed its product to market), Abbott should be allowed to introduce evidence of its research efforts and expenses to rebut TorPharm's argument. The Court agrees. Abbott is permitted to rebut any such arguments with evidence of its research efforts and monetary investments.

Finally, Abbott argued that if TorPharm is allowed to argue that it is a manufacturer of lower cost drugs (the subject of one of Abbott's motions in limine), then Abbott must be able to explain that it invested substantial time and money in getting its product to market. Abbott's argument is

---

[14]    As discussed above, the Court disagrees with TorPharm's argument in its supplemental memorandum that Abbott has not proved the oligomeric structure of its own product. That issue has been resolved by the Federal Circuit. Abbott Labs., 300 F.3d at 1372, 1378.

moot, as the Court has granted Abbott's motion to exclude references to TorPharm as a manufacturer of lower costs drugs or to TorPharm's product as a lower cost alternative to Abbott's product.

Thus, TorPharm's motion in limine is granted with the understanding that if TorPharm takes the position at trial that Abbott did not undertake extensive safety and efficacy trials for divalproex sodium, Abbott may introduce evidence of the substantial time and money it invested in taking its product to market.

**F.    Evidence of Abbott Labs. v. Alra Labs. Lawsuit**

TorPharm moves to exclude evidence relating to a prior lawsuit, Abbott Labs. v. Alra Labs., 1997 WL 667796 (N.D. Ill. 1997), in which Judge Zagel held that the same patents asserted against TorPharm in this case were valid and that Alra infringed Abbott's patents.  TorPharm moves to exclude evidence relating to the court's claim construction and finding of infringement in Alra.  In support of this motion, TorPharm argued that the Alra lawsuit was irrelevant and that, even if it were somehow relevant, the facts of the Alra litigation would be unfairly prejudicial in this case, as a jury might believe that the patents were infringed in this case simply because the patents were infringed in Alra.

Abbott initially responded that the claim construction in Alra should be admissible as relevant to the claim construction in this case based on Markman v. Westview Instruments, Inc., 517 U.S. 370, 391 (1996).  Since the filing of this motion in limine, the district court construed the claims in the same manner as Judge Zagel did in Alra, and this construction was affirmed by the Federal Circuit.  See Abbott Labs., 300 F.3d at 1372-73.  Based on these decisions, Abbott asserts that TorPharm's motion to exclude references to the claim construction in Alra is moot.  Pl's Supp. Mem., p. 27.  The Court agrees that the Federal Circuit has resolved the issue of claim construction.

-44-

TorPharm's motion to exclude references to the claim construction in Alra is denied as moot.

Abbott also argued in its motion that the Alra decision is relevant to the issue of wilful infringement. The Court agrees. To prove wilful infringement, Abbott must show that TorPharm had no reasonable basis for believing that the patents were invalid or that TorPharm's proposed product did not infringe Abbott's patent. Hoechst Celanese Corp. v. BP Chemicals Ltd., 78 F.3d 1575, 1583 (Fed. Cir. 1996). The existence of the Alra decision may have a tendency to make it more probable that TorPharm had no reasonable basis for believing that the patents were invalid or that its proposed product did not infringe the patents when it filed its ANDA in 1997 and continued to prosecute its ANDA. Thus, this portion of TorPharm's motion is also denied.

Lastly, in its supplemental memorandum, Abbott contends that the Alra decision is also relevant to whether Abbott's molecular weight tests are sufficient to demonstrate that TorPharm's product is an oligomer. The Alra decision concerned the same two patents at issue here. In that case, Judge Zagel found that the very same molecular weight tests performed in this case were adequate to demonstrate the oligomeric structure of the product at issue in that case. The district court reached the same conclusion. Abbott Labs., 156 F.Supp.2d at 746 (stating "as Judge Zagel found in the Alra case, the tests Abbott performed are sufficient to show the chemical structure of divalproex sodium."). TorPharm, in its supplemental memorandum, argues that evidence of the Alra decision should be excluded because the infringement question concerns TorPharm's product, not Abbott's or Alra's.

The Court agrees that the focus of the infringement inquiry must be on TorPharm's proposed product, not Abbott's or Alra's. However, the Alra court's discussion regarding the sufficiency of molecular weight testing may have some bearing on the sufficiency of molecular weight testing to

prove oligomeric structure which is at issue in this case. As Abbott pointed out, the district court

has already relied on Alra as one piece of support for its determination regarding the probativeness

of molecular weight testing. Abbott has not explained how it will attempt to admit the Alra decision

into evidence but has asserted that the district court may take judicial notice of the Alra decision.

This Court does not decide whether the district court should take judicial notice of the Alra decision,

but denies TorPharm's motion on relevance grounds.[15]

## G. Testimony or Argument Attempting to Cast TorPharm in a Negative Light Because They Are Canadian Companies

TorPharm seeks an order prohibiting Abbott and its counsel and witnesses from attempting

to cast TorPharm, Inc. and Apotex, Inc. in a negative light before a jury because they are Canadian

companies. Specifically, TorPharm seeks to prohibit Abbott's counsel from making "any allusions

or insinuations" that "might tend to hold an American company in greater favor than it would a

foreign company." As Abbott pointed out, TorPharm failed to cite any evidence which might

encourage a trier of fact to hold TorPharm in a negative light because it is Canadian. Since

TorPharm's motion is too vague to provide guidance to Abbott or the Court regarding what evidence

or references to Canada or Canadians might be prohibited and because this Court has recommended

that a bench trial be held in this case (thereby minimizing the potential for the fact-finder to be biased

by such evidence), TorPharm's motion is denied without prejudice. TorPharm may reassert its

motion at trial if necessary.

---

[15] Given the Court's recommendation that a bench trial be held, the Court finds no merit in TorPharm's Rule 403 challenge to the Alra decision. Moreover, even if there is to be a jury trial (if the district court does not adopt this Court's recommendation), the district court can give a limiting instruction to minimize any risk of unfair prejudice.

## H. Evidence of *Fortune* Magazine Article

TorPharm moves to bar evidence of an article in the September 6, 1999 issue of *Fortune* magazine entitled "Drug Spies." TorPharm argued that this article could be used to cast defendant Apotex and its CEO, Barry Sherman, in a negative light. The article states that "Apotex's business strategy is to get involved in lawsuits and extract settlements." The CEO of Eli Lilly is quoted as stating, "While we and other research-based companies choose to innovate . . . they [Sherman and his ilk] basically choose to litigate. I consider their legal expenses a little bit like our R&D expenses." The article further indicates that in 1995, Sherman was caught importing a generic version of Prozac to U.S. customers through a mail-order system involving a Bahamian front company without FDA approval, which resulted in Apotex signing a plea agreement.

The article is not relevant to the remaining infringement issue, and Abbott admits that it does not intend to introduce evidence related to the *Fortune* magazine article in its case in chief. TorPharm's motion is granted with the understanding that Abbott may cross-examine Dr. Sherman about evidence related to the article if Dr. Sherman opens the door to such evidence at trial.

## I. Testimony and Evidence of "60 Minutes" Episode Featuring TorPharm's CEO

TorPharm moves to exclude evidence relating to an episode of the television program "60 Minutes" which featured an interview between reporter Lesley Stahl and TorPharm's CEO, Barry Sherman. The segment involved Apotex's relationship with a former research employee who alleged that Apotex directed her to keep from her patients the negative findings on an experimental drug used to treat a potentially fatal blood disease.

The interview is irrelevant to any issue remaining in this lawsuit, and Abbott indicated that it does not intend to introduce evidence relating to the "60 Minutes" episode in its case in chief. The

motion is granted with the understanding that Abbott will not be foreclosed from cross-examining Dr. Sherman about the "60 Minutes" episode if he opens the door to such evidence at trial.

## J.    Evidence of Litigation Involving FDA's Personal-Use Importation Exemption

TorPharm moves to bar evidence of business activities conduced in reliance on the FDA's personal-use importation exemption policy, including evidence surrounding the plea agreement and judgment entered in United States v. Medicine Club Int'l Inc., No. AW-94-0373 (D. Md. 1995), and evidence surrounding two Canadian proceedings involving one of Apotex's customers, Interpharm, Inc., arising out of those activities. The FDA has a discretionary policy of not enforcing regulations against importation of personal use quantities of unapproved new drugs in certain circumstances. Defendant Apotex apparently sold drug products to Medicine Club International, Inc., which in turn sold the products to United States citizens without FDA approval. No ANDA was filed with the FDA to market the drug products. Medicine Club was not authorized to sell those products in the United States. The FDA notified Apotex and Medicine Club that their mailings of personal use quantities did not fall within the FDA's personal-use importation policy. Apotex and Medicine Club apparently continued to sell the products to United States citizens and later entered a plea agreement with the government as a result of those practices.

Abbott represented that it does not intend to introduce evidence relating to the legal proceedings surrounding the FDA's personal-use importation exemption in its case in chief. Abbott asserted, however, that this evidence is relevant to cross-examine TorPharm's witnesses at trial concerning TorPharm's credibility and truthfulness with the FDA and TorPharm's "pattern of playing fast and loose with the FDA and its regulations."

Evidence of TorPharm's prior conduct with the FDA may not be used to prove TorPharm's veracity in dealing with the FDA in this case, including its alleged "pattern of playing fast and loose with the FDA and its regulations." Federal Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." In this Circuit, evidence of "other acts" is admissible only if it meets the following four part test: (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue; (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the probative value of the evidence is not outweighed by the danger of unfair prejudice. United States v. Asher, 178 F.3d 486, 492 (7th Cir. 1999). The fourth prong of the test incorporates Rule 403, which provides for the exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time. United States v. Robinson, 161 F.3d 463, 467 (7th Cir. 1998). Evidence of "other acts" is admissible to establish "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). Rule 404(b) applies to civil cases as well as to criminal cases. Huddleston v. United States, 485 U.S. 681, 685 (1988).

Evidence of TorPharm's prior dealings with the FDA concerning the personal-use importation exemption fails to satisfy at least one of the four prongs of the test. Specifically, the evidence does not tend to establish something other than TorPharm's alleged "pattern of playing fast and loose with the FDA and its regulations." Abbott has not shown that motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident are at issue in this patent infringement action. TorPharm's motion in limine is granted.

## IV. CONCLUSION

For the reasons stated above, Abbott's motions in limine are granted in part and denied in part, and TorPharm's motions in limine are granted in part and denied in part.

ENTER:

Nan R. Nolan
United States Magistrate Judge

Dated: Oct 24, 2003